**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| EMC CORPORATION, Plaintiff, v. JAMES PETTER, Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. _____ Jury Trial Demanded |

## COMPLAINT

Plaintiff EMC Corporation ("Plaintiff" or "EMC"), through its undersigned counsel, brings this Complaint for declaratory judgment and attorneys' fees and costs, and alleges as follows:

### Introduction

1. The actions that have prompted this lawsuit are a recent installment in a deliberate scheme by Pure Storage, Inc. ("Pure Storage") to collude with former EMC employees to violate their legal obligations to EMC, and to misappropriate and bring to Pure Storage competitively sensitive confidential EMC information and trade secrets. Since 2013, dozens of former EMC employees have joined Pure Storage and taken with them tens of thousands of pages of proprietary, highly confidential and competitively sensitive EMC materials – including highly specific information about EMC's directly competing flash storage solution, EMC's strategies to implement and sell that solution, and targeted, detailed information about EMC's customers and their buying patterns.

2. On November 4, 2013, EMC filed suit against Pure Storage to put a stop to this conduct, and to seek redress for the harm it has caused EMC. That lawsuit remains pending. In addition, since August 2011, EMC has been compelled to bring several lawsuits against former employees who have, as part of this scheme, resigned from EMC and attempted to misappropriate EMC's confidential and proprietary trade secret and other information for the benefit of their new employer, EMC's competitor, Pure Storage.

3. Although Pure Storage's scheme began in the United States, it has not been confined to this country. Between December 2nd 2014 and February 4th 2015 alone, thirteen (13) employees of EMC's United Kingdom and Ireland business announced their resignation, and disclosed that they will be working for Pure Storage.

4. Defendant James Petter ("Petter") is one of the most recent employees of EMC's United Kingdom and Ireland business to join Pure Storage. On January 15, 2015, three days after he returned to the United Kingdom from an EMC Leadership Summit in Boston at which senior EMC managers and executives discussed confidential business information, including sales performance and results for 2014 and strategies and initiatives for 2015, Petter announced that he is resigning from EMC Europe Ltd., where he has been employed for the last decade, and will begin working for EMC's competitor, Pure Storage.

5. In this action, EMC asks the Court to enter a declaratory judgment declaring that (i) in light of Petter's resignation, all Restricted Stock Units (RSUs) that were granted to Petter but had not vested as of January 15, 2015 are expired and forfeited; and (ii) 8,721 shares of EMC stock, which reflect RSUs that vested within the six months prior to his resignation, are rescinded. In addition to declaratory relief, this action also seeks, pursuant to the applicable

policies governing the RSUs, an award of Plaintiff's reasonable costs and attorneys' fees in bringing this action.

### Parties

6. Plaintiff EMC is a Massachusetts corporation with its principal executive offices in Hopkinton, Massachusetts.

7. On information and belief, Defendant Petter resides in Surrey, England. Petter commenced employment with EMC Europe Ltd., a subsidiary of EMC, on February 23, 2004. In his most recent position with EMC Europe Ltd., he served as Senior Vice President and Managing Director for the United Kingdom and Ireland. On January 15, 2015 Petter resigned from EMC Europe Ltd. and advised that he would begin to work for EMC's competitor, Pure Storage, following a one-month notice period. His employment with EMC Europe Ltd. thus ended on February 14, 2015.

### Jurisdiction and Venue

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between EMC and Petter, who is a citizen of a foreign state, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over the Defendant because, among other things, he consented and agreed pursuant to Section 13 of the EMC Corporation Amended and Restated 2003 Stock Plan (as amended and restated as of May 1, 2013) (the "Stock Plan"), attached as Exhibit A, to submit to the exclusive jurisdiction of courts within the Commonwealth of Massachusetts to resolve issues that may arise out of or relate to the Stock Plan.

10. This Court also has personal jurisdiction over Defendant because he transacted business and contracted with EMC in Massachusetts on matters directly related to the current dispute. *See* M.G.L. c. 223A, §3(a).

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and because the Defendant is subject to personal jurisdiction in this district with respect to this action. In addition, venue is proper in the District of Massachusetts because jurisdiction is exclusively vested in the federal and state courts of Massachusetts under the terms of the Stock Plan. EMC does business in, and therefore resides in, multiple counties within this district, including Middlesex, Suffolk, Norfolk and Worcester. EMC is filing this lawsuit in the Central Division, based on its residency in Worcester County. The forensic review, which is discussed in Paragraph 52 below (and remains ongoing), is being managed from EMC's facilities in Southborough, Massachusetts, which is in Worcester County.

**Factual Allegations**

12. EMC is a global leader in enabling businesses and services providers to store, manage, protect and analyze their information in an agile, trusted and cost-efficient way. Among other things, EMC pioneered the development of storage systems and related software known as "enterprise storage products," which store and permit retrieval of massive amounts of digital information.

13. EMC competes with many companies in the markets that it serves, and its products have achieved broad market acceptance due in large part to their technological superiority to competing offerings and the team of skilled EMC sales professionals and technical consultants who effectively market and sell these products to EMC's customers. In order to maintain this competitive advantage, EMC expends substantial resources to safeguard and

protect its confidential information, to develop and solidify its relationships with customers, potential customers and business partners and to retain, train and compensate its skilled employees.

*Pure Storage's Ongoing Scheme to Obtain EMC Employees and Confidential Information*

14. The enterprise storage market is intensely competitive, particularly with respect to pricing, which significantly impacts the development and sustainability of customer relationships. The sales process for enterprise storage solutions often requires that pricing and terms be negotiated on a customer-by-customer basis. As a consequence of their employment with EMC, sales personnel and technical consultants develop strong relationships with customers, on behalf of EMC, and develop critically sensitive pricing solutions and strategies tailored for each individual customer. EMC's solutions often include ongoing consultation, maintenance, and support services.

15. Unfortunately, rather than attempt to compete legitimately with EMC, Pure Storage has improperly obtained and benefited from critically sensitive EMC confidential information from former EMC employees in order to (i) target and raid a collection of EMC's highest achieving technical and sales professionals, (ii) assign former EMC employees to unlawfully interfere with EMC's customer relationships, with knowledge that such actions violate the terms of their employment agreements, and (iii) use for its own benefit EMC's confidential information as Pure Storage seeks to sell competing products in the enterprise storage marketplace.

16. Since August 2011, approximately 150 of EMC's highly valued technical engineers and sales professionals have left EMC and joined Pure Storage. These talented former EMC employees possess confidential knowledge and information about EMC's technologically

superior storage systems and the particular implementations of those systems at some of EMC's most strategically valuable customers. In many instances, these individuals were among the highest performing EMC professionals in their positions in their respective geographic locations.

17. Numerous former EMC employees who have joined Pure Storage have misappropriated EMC confidential information and property that would be very useful to an EMC competitor such as Pure Storage.

*Defendant's Employment with EMC Europe Ltd.*

18. Petter began working at EMC Europe Ltd. on February 23, 2004, as a District Sales Manager in the investment banking sector. In this position, Petter's responsibilities included managing the activities of a number of sales representatives within Petter's sales district, developing a "pipeline" of sales opportunities, maintaining information about customer needs, purchases, and preferences, and cultivating business relationships with key customers. Petter moved to cover new business opportunities in 2006, again as a District Sales Manager. As a district manager, Petter was exposed to competitively sensitive and highly confidential information on EMC's pricing and go-to-market strategies for his assigned territories as well as information regarding sales pipeline opportunities. He also had access to confidential information concerning sales performance of key employees, buying patterns of key customers, and critical decision makers within customer organizations.

19. On November 12, 2008, Petter was appointed as Director, Global Accounts – EMEA (Europe, Middle East, and Africa), employed by EMC Europe Ltd. In this role, Petter oversaw account planning, sales strategy, and execution for EMC's major global strategic accounts in the financial services, telecommunications, oil and gas, and public sector industries

across the entire EMEA region. The breadth and depth of confidential information available to Petter increased commensurate with his increased level of responsibility and geographic reach.

20. At the time he was appointed to Director, Global Accounts – EMEA, Petter received and countersigned an agreement that sets forth certain terms and conditions of his employment with EMC Europe Ltd, and which incorporates by reference EMC's Key Employee Agreement, the EMC Europe Employee Handbook, and EMC's corporate policies.

21. Among other terms and conditions, Petter's agreement contains the following provisions:

> **13. RETURN OF COMPANY MATERIALS**
>
> Immediately following your resignation or termination as an employee of the Company, you agree to turn over to the Company, all Company owned materials, documents and property in your possession or control, relating to work done for the Company or relating to the processes and materials of the Company. You also agree to return all materials concerning future or potential clients and/or customers. You also agree to return all materials provided by customers of the Company and all teaching materials provided by the Company. Such materials includes, but is not limited to, customer and/or vendor lists, customers and/or vendor prospect material, price lists, rate structures, software owned or developed by the Company for any purpose in any form, listing, documentation, proposals or any other material to the Company.
>
> **14. LIMITED NON-COMPETITION**
>
> As long as you are employed by the Company, you shall devote your full time and efforts to the Company and shall not participate directly or indirectly, in any capacity, in any business or activity that is in competition with the Company. During your employment with the Company and for the twelve month period following the effective date of your termination or resignation from the Company, you agree not to directly or indirectly develop, produce, market, solicit or sell products or services competitive with products or services being offered by the Company. (You shall not be considered in competition unless you have an ownership interest amounting to at least 1% in the enterprise, whether direct or indirect by way of opinion or otherwise, or an officership, directorship or other policy making executive position with the competing enterprise.)

**16. CUSTOMER AND VENDOR CONFIDENTIALITY**

All Employees must recognise that it is essential to the Company's success that all customers and vendor information is deemed to be confidential and must be properly treated as a confidential trade secret. Therefore, you must not use or disclose any such customer or vendor information except as may be necessary in the normal conduct of the Company's business for the specific customer or vendor, and after the end of employment with the Company, you will return all such materials to the Company.

**17. CONFIDENTIALITY OF COMPANY MATERIALS**

You must recognise that both during your employment with the Company and thereafter you must not use for your own benefit, or divulge or disclose to any person outside of the Company, any information not already lawfully available to the public concerning the Company or any of its customers or suppliers ("Confidential Information") including but not limited to any products, product development, business strategy, financial information, or customer, supplier or Employee lists. Confidential information also includes, without limitation, any technical data, design, pattern, formula, computer programme, source code, object code, algorithm, subroutine, manual, product specification or plan for a new, revised or existing product, any business, marketing, financial or sales order, and the present or future business or products of the Company.

22.     On May 3, 2011, Petter was promoted to Vice President and Managing Director, and on April 14, 2014, Petter was promoted to Senior Vice President and Managing Director for EMC's United Kingdom and Ireland business. Following these promotions, Petter's employment remained subject to the terms and conditions of his employment agreement with EMC Europe Ltd. and the additional terms, conditions and policies referenced therein.

23.     In his Vice President and Senior Vice President roles, Petter held the most senior position within EMC's UK and Ireland business, serving as the Managing Director of all business units within that region. As Managing Director, Petter was responsible for delivering and supporting the full range of EMC products, services and solutions to organizations in established and new markets in the UK and Ireland region. He was also responsible for enhancing partner and channel sales relationships, and building and maintaining major customer

relationships. Petter managed an organization of approximately 1700 employees, and had access to all information about the business virtually on demand.

24. By way of example, Petter received several internal reports on a regular basis containing highly sensitive sales data that would be very valuable to an EMC competitor. One such report is a "dashboard" setting forth sales activity on products competitive with those of Pure Storage. Another report contains a forward looking comprehensive sales forecast, analyzed by product, end user, channel partner, assigned salesperson, anticipated closing date, industry segment and other key variables.

25. Petter also could and did request specialized reports. For example, in December 2014, just weeks before he resigned and after he had commenced discussions with Pure Storage, Petter requested and received a spreadsheet containing extremely detailed and competitively sensitive information about all EMC customers in the UK and Ireland.

26. Petter also had significant authority to act on behalf of EMC's UK subsidiaries, having been granted a power of attorney by the statutory directors of EMC Europe Ltd. and EMC Computer Systems (U.K.) Limited appointing Petter as a representative of both companies, and enabling him to manage and perform certain acts for and on behalf of those companies, including the authority to sign offers, quotations and contracts with respect to products or services sold, leased or licensed, and the authority to sign offer letters to candidates, employment contracts, and notices of termination/dismissal of employees.

27. As Petter was promoted to more senior positions, his compensation naturally increased. For 2014, Petter's total cash compensation plan included a substantial salary and eligibility for multiple bonuses tied to sales achievement.

28. In addition to the total cash compensation paid by EMC Europe Ltd. as his employer, Petter received a number of awards of EMC Restricted Stock Units ("RSUs") issued by EMC Corporation. An RSU is a contractual right to receive a share of EMC Corporation stock at some future time, if certain conditions are met. If the conditions are met, the RSU is considered to have "vested," at which point certain forfeiture restrictions lapse and the stock is issued or credited to the employee, subject to certain continuing obligations detailed below. If the conditions are not met, then the RSU expires and is forfeited without vesting. The granting of RSUs by EMC Corporation is not a benefit or right under the terms of Petter's contract of employment with EMC Europe Ltd. These are separate awards that are expressly not part of "normal and expected compensation," and are granted at the sole discretion of EMC Corporation.

29. Petter received nine awards of RSUs since August 2010. Some of the RSUs had vested as of the date of Petter's resignation and some had not.

30. Three of the awards were due to vest, in part, in February 2015, if applicable conditions had been satisfied at that time.

31. Three of the awards vested in part on August 3, 2014, August 8, 2014 and July 31, 2014, respectively. Petter received an aggregate total of 8,721 EMC shares on these dates, as a result of these partial vesting events.

32. At the time they were made, each award of RSUs was accompanied by, and subject to, a Restricted Stock Unit Agreement ("RSU Agreement"). Petter signed and/or electronically accepted each award communication, acknowledging and accepting in each case that he had been provided with the RSU Agreement governing the RSUs, and that he agreed to be bound by the terms and conditions applicable to the RSUs.

33. Each RSU Agreement referenced, among other things, the EMC Corporation's Amended and Restated 2003 Stock Plan, as amended from time to time (the "Stock Plan"). The Stock Plan is attached as Exhibit A. The RSU Agreements provide, and Petter's electronic acceptance of the awards acknowledged and agreed, that in addition to being subject to the RSU Agreement, the RSUs are also subject to the terms and conditions set forth in the Stock Plan.

*Defendant's Resignation*

34. Pure Storage does business in both the United Kingdom and Ireland, the areas over which Petter had responsibilities in his most recent position as Senior Vice President and Managing Director of EMC UK and Ireland. Pure Storage's efforts improperly to recruit and hire EMC employees have extended to these countries.

35. For example, in the last three months alone, thirteen (13) employees working for the EMC UK and Ireland business submitted their resignation. On information and belief, all thirteen employees intend to work for Pure Storage and resigned for that reason.

36. It is now clear that, as of mid-November 2014, Petter was also engaged in communications with representatives of Pure Storage about a plan to resign from EMC Europe and accept employment working for Pure Storage.

37. In early January 2015, Petter travelled to San Francisco to discuss possible employment with Pure with Pure's most senior executives, including its Chief Executive Officer. After meeting with Pure's Chief Executive Officer and verbally accepting his new position at Pure, Petter flew to Boston and attended a portion of EMC's annual Leadership Summit. The purpose of the Leadership Summit is to assemble key management personnel and discuss, among other things, EMC's strategies and key initiatives for the coming year, results of past periods, and other high-level business matters. Given the highly competitive area in which EMC operates

and the sensitive topics that are addressed, attendance at the Summit is by invitation only, and the meetings are regarded as highly confidential, with access to meeting materials restricted.

38. Although Petter was, unbeknownst to EMC, actively communicating and meeting with Pure Storage representatives about a position, and received and verbally accepted an offer of employment on Friday, January 9, he nevertheless attended the portion of the Leadership Summit that focused on the "EMEA" region (Europe, Middle East, and Africa), i.e., the very region he will lead for Pure Storage.

39. Petter left Boston late on January 11, 2015, and returned to the United Kingdom. He formally accepted a position with Pure Storage the next day.

40. On January 15, 2015, Petter announced that he would resign from EMC Europe Ltd. in order to work for Pure Storage. Petter's title at Pure Storage will be Vice President, EMEA, reporting to the President of Pure Storage. Indeed, Pure Storage has confirmed publicly that it expects Petter to "lead Pure Storage EMEA through its next phase of explosive growth."

41. The terms of Petter's employment agreement with EMC Europe Ltd. require him to provide a period of one month's notice before his employment terminates fully. That period expired on February 14, 2015, after which, Petter has informed EMC, he will begin his work for Pure Storage.

42. No later than February 17, 2015, and as of the date of filing this Complaint, Petter's "Linkedin" page listed his employment as "VP EMEA at Pure Storage." The page stated that he has held this position with Pure Storage from "February 2015 – Present (1 month)."

### *Effect of Termination on Defendant's Restricted Stock Units.*

43. Both the RSU Agreement and the Stock Plan provide that, except in the case of death, disability, or retirement, RSUs will not vest unless, at the designated time, the individual's "service relationship" with EMC or its subsidiaries is intact, and has not been terminated.

44. Pursuant to Section 6.6.4 of the Stock Plan (attached as Exhibit A), EMC has "the sole discretion to set the date of termination for purposes of the Plan, without regard to any notice period or other obligation under the applicable laws of the jurisdiction where the Participant is employed or engaged."

45. The Company has set January 15, 2015, the date that Petter resigned from EMC Europe Ltd., turned in his computer and EMC-owned devices, and announced that he would be working for EMC's competitor Pure Storage, as the date of his termination for purposes of the Plan.

46. Accordingly, all RSUs granted to Petter that had not vested as of January 15, 2015 are expired and forfeited. This includes any RSUs granted to Petter that would have vested in February 2015, if the applicable conditions had been met.

47. The Stock Plan also contains a provision pursuant to which awards that have already vested can be cancelled and rescinded. Stock Plan (Exhibit A) at ¶6.7. That section provides:

> 6.7 *Cancellation and Rescission of Awards*. The following provisions of this Section 6.7 shall apply to Awards granted to (a) Participants who are classified by the Company or a Subsidiary as an executive officer, senior officer, or officer (collectively, "Officers") of the Company or a Subsidiary, (b) Participants who are Eligible Directors, and (c) certain other Participants designated by the Committee or the Board of Directors to be subject to the terms of this Section 6.7 (such designated Participants together with Officers and Eligible Directors referred to collectively as "Senior Participants"). The Committee or the Board of Directors may cancel, rescind, suspend or otherwise limit or restrict any unexpired Award at any time if the Senior Participant engages in "Detrimental

Activity" (as defined below).  Furthermore, in the event a Senior Participant engages in Detrimental Activity at any time prior to or during the six months after any exercise of an Award, lapse of a restriction under an Award or delivery of Common Stock pursuant to an Award, such exercise, lapse or delivery may be rescinded until the later of (i) two years after such exercise, lapse or delivery or (ii) two years after such Detrimental Activity.  Upon such rescission, the Company at its sole option may require the Senior Participant to (A) deliver and transfer to the Company the shares of Common Stock received by the Senior Participant upon such exercise, lapse or delivery, (B) pay to the Company an amount equal to any realized gain received by the Senior Participant from such exercise, lapse or delivery, or (C) pay to the Company an amount equal to the market price (as of the exercise, lapse or delivery date) of the Common Stock acquired upon such exercise, lapse or delivery minus the respective price paid upon exercise, lapse or delivery, if applicable.  The Company shall be entitled to set-off any such amount owed to the Company against any amount owed to the Senior Participant by the Company.  Further, if the Company commences an action against such Senior Participant (by way of claim or counterclaim and including declaratory claims), in which it is preliminarily or finally determined that such Senior Participant engaged in Detrimental Activity or otherwise violated this Section 6.7, the Senior Participant shall reimburse the Company for all costs and fees incurred in such action, including but not limited to, the Company's reasonable attorneys' fees.  As used in this Section 6.7, "Detrimental Activity" shall include:  (I) the failure to comply with the terms of the Plan or certificate or agreement evidencing the Award; (II) the failure to comply with any term set forth in the Company's Key Employee Agreement (irrespective of whether the Senior Participant is a party to the Key Employee Agreement); (III) any activity that results in termination of the Senior Participant's Service Relationship for Cause; (IV) a violation of any rule, policy, procedure or guideline of the Company; or (V) the Senior Participant being convicted of, or entering a guilty plea with respect to a crime whether or not connected with the Company.

48.     Petter was a senior officer of EMC Europe Ltd. at the time he submitted his resignation, and is subject to this Section 6.7 of the Stock Plan.  Petter also agreed, in the RSU Agreements he signed and/or electronically accepted in connection with RSU awards, to be bound by Section 6.7 of the Stock Plan.

49.     Petter has engaged in numerous acts which constitute Detrimental Activity pursuant to Section 6.7 of the Stock Plan.

50.     For example, Petter committed Detrimental Activity by discussing and agreeing to become employed by Pure Storage while he was still an employee of EMC Europe Ltd., Pure

Storage's competitor.  Indeed, Petter has informed EMC that he first spoke with a Pure Storage "recruiter" in November 2014.

51. Petter traveled to Boston *when he was in the midst of his final negotiations with Pure Storage*, and attended a day-long confidential meeting at which EMC's highly sensitive and proprietary strategy with respect to the EMEA territory was discussed.  On information and belief, this region is the same region over which Petter will have responsibility in his new position with Pure Storage, yet Petter did not disclose to anyone present that he had accepted a position with Pure and intended to resign from EMC within days.

52. A forensic review of Petter's EMC-owned computer, analyzed at EMC's facilities in Southborough, Massachusetts, has revealed that in November 2014, precisely when he began his discussions with Pure Storage, he researched online how to export contacts from Microsoft Outlook (EMC's corporate email program) to an external email program, and that he subsequently exported two files labeled "contacts."  On information and belief, those contacts include EMC confidential information concerning EMC's customers, employees and business partners.

53. Petter has also announced that he intends to commence work for Pure Storage shortly after February 16, 2015, which will fall within the twelve-month period during which he promised in his employment agreement not to engage in activities that would compete with EMC.  No later than February 17, 2015, Petter was already holding himself out on his "Linkedin" page as the "VP EMEA at Pure Storage."

54. Petter's new position with Pure Storage is an "officership, directorship, or other policy making executive position with [a] competing enterprise."

55. Petter's actions thus constitute, at a minimum, a violation of Sections 13, 14, 16 and 17 of his employment agreement and a violation of numerous policies of EMC, including provisions of the Key Employee Agreement that prohibit working for a competitor, and provisions of EMC's Business Conduct Guidelines, which require Petter to devote his full time and efforts to EMC, avoid actions that might constitute a conflict of interest, and safeguard EMC confidential information, including customer information.

56. Based on the foregoing violations of his employment agreement and company policy, the Committee, pursuant to Section 6.7 of the Stock Plan, has rescinded all 8,721 shares of EMC stock that lapsed in the six month period up to and including January 15, 2015, which is the day Petter announced that he would resign from EMC Europe and begin working for EMC's competitor, Pure Storage.

**COUNT ONE – DECLARATORY JUDGMENT**

57. EMC incorporates by reference Paragraphs 1-56 as if set forth fully herein.

58. The Company has set January 15, 2015 as Petter's date of termination for purposes of the Restricted Stock Units previously issued to Petter.

59. As a result, any RSUs issued to Petter that had not vested as of January 15, 2015 are expired and forfeited.

60. Petter has indicated his disagreement with the cancellation of his RSUs. An actual controversy therefore exists between the parties regarding the expiration and forfeiture of Petter's RSUs that had not vested as of January 15, 2015.

61. EMC seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that any RSUs issued to Petter that had not vested as of January 15, 2015 are expired and forfeited.

**COUNT TWO – DECLARATORY JUDGMENT**

62. EMC incorporates by reference Paragraphs 1-61 as if set forth fully herein.

- 16 -
6524308

63. Petter has engaged in Detrimental Activity as that term is defined in Section 6.7 of the Stock Plan.

64. Based on Petter's actions, the Committee has rescinded 8,721 shares of EMC stock (vested RSUs) issued to Petter within the six months prior to January 15, 2015. Petter must, at EMC's option, either return 8,721 shares to EMC or pay to EMC an amount equal to the market price of the stock acquired at the time that the shares vested.

65. Based on Petter's actions, the Committee has also acted to ratify the cancellation of Petter's RSUs that had not vested as of January 15, 2015.

66. Petter has disputed that he has engaged in Detrimental Activity. An actual controversy therefore exists between the parties with respect to the cancellation and rescission of the EMC stock awards issued to Petter, as set forth herein.

67. EMC seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that (i) on or before January 15, 2015 (and on numerous dates thereafter), Petter engaged in Detrimental Activity; (ii) that based on that Detrimental Activity, the Committee has rescinded 8,721 shares of EMC stock (vested RSUs) issued to Petter within the six months prior to January 15, 2015; that (iii) Petter must, at EMC's option, either return 8,721 shares to EMC or pay to EMC an amount equal to the market price of the stock acquired at the time that the shares vested; and (iv) any RSUs issued to Petter that had not vested as of January 15, 2015 are expired and forfeited.

## COUNT THREE – ATTORNEYS' FEES AND COSTS

68. EMC incorporates by reference Paragraphs 1-67 as if set forth fully herein.

69. Section 6.7 of the Stock Plan provides that, if the Company commences an action against a Senior Participant in which it is preliminarily or finally determined that such Senior Participant engaged in Detrimental Activity, the Senior Participant shall reimburse the Company

for all costs and fees incurred in such action, including but not limited to the Company's reasonable attorneys' fees.

70. To the extent EMC is the prevailing party on its declaratory judgment claim regarding Petter's Detrimental Activity (Count Two), EMC is entitled to an award requiring Petter to reimburse EMC's costs and attorneys' fees pursuant to this provision.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EMC Corporation respectfully requests that this Court enter judgment in its favor as follows:

A. Enter declaratory judgment that any RSUs issued to Petter that had not vested as of January 15, 2015 are expired and forfeited;

B. Enter declaratory judgment (i) that on or before January 15, 2015 (and on numerous dates thereafter), Petter engaged in Detrimental Activity; (ii) that based on that Detrimental Activity, the Committee has rescinded 8,721 shares of EMC stock (vested RSUs) issued to Petter within the six months prior to January 15, 2015; (iii) that Petter must, at EMC's option, either return 8,721 shares to EMC or pay to EMC an amount equal to the market price of the stock acquired at the time that the shares vested; and (iv) that any RSUs issued to Petter that had not vested as of January 15, 2015 are expired and forfeited;

C. Grant EMC an award of its costs and reasonable attorneys' fees; and

D. Grant such other relief that the Court deems just and equitable in the circumstances.

Respectfully submitted,

EMC CORPORATION

By its attorneys,

/s/ *Joan A. Lukey*
Joan A. Lukey (BBO No. 307340)
joan.lukey@choate.com
Justin J. Wolosz (BBO No. 643543)
jwolosz@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000

*Of Counsel*

Paul T. Dacier (BBO No. 616761)
Elizabeth M. McCarron (BBO No. 567517)
EMC Corporation
176 South Street
Hopkinton, MA 01748
Tel: (508) 435-1000

Dated:  February 27, 2015